Case number five for this morning is Manuel v. Nalley. Ms. Squires. Good morning, Your Honors, and may it please the Court. This is not a summary judgment case. The events that led to Mr. Manuel filing grievances and preparing a lawsuit and the events that followed that protected speech show there is a genuine issue of fact on causation. Manuel warned prison officials that his cellmate was going to attack him, but the prison officials failed to intervene. Manuel then filed grievances and began preparing a lawsuit to hold the prison officials accountable. The undisputed events that followed create a convincing mosaic sufficient to show that word about Manuel's lawsuit had traveled. You realize that two years ago we told district judges and lawyers to stop using that metaphor. That's not quite correct, Your Honor. What this Court said was that that metaphor is not a legal test, but it remains an apt metaphor for showing causation. No, we did not. Go ahead. But if I were you, doing something the circuit has said not to do just doesn't help. I take that point, Your Honor. The evidence in this case shows that word about Manuel's grievances had traveled throughout this small wing of the prison and that the prison officials engaged in a concerted effort to punish Manuel for complaining about their misconduct. Three events that occurred after Manuel's protected speech are particularly noteworthy. First, key witness and prison employee, Jennifer Wilson, admitted that prison officials directed another inmate to steal Manuel's lawsuit papers. Second, a mere nine minutes after Defendant Miller confronted Manuel about his grievances, Defendant Nally conducted the shakedown. Third, after confiscating papers about Manuel's lawsuit, prison officials sent Manuel to segregation and ultimately transferred him to a higher security prison. This evidence is sufficient to create a genuine issue of fact on causation, and this Court should reverse the District Court's summary judgment decision and remand the case for further proceedings. It is important to remember the standards at issue in this case. All inferences are in Manuel's favor, and it is the Defendant's burden to show there is no genuine issue of fact. But the events that followed Manuel's protected speech show that there are. First, Wilson's testimony is very important. She testified that Defendant Nally was hostile towards prisoner litigation and even threatened her because she helped prisoners with their lawsuits. She also testified about the prison's specific interference with Manuel's lawsuit, that the prison officials had another inmate steal Manuel's lawsuit papers and then secretly photocopy them, and then had that inmate stick them back in Manuel's storage box. Wilson also testified that the day this stealing of the lawsuit papers happened, which was June 12, 2015, it was the same day that Manuel had sent a follow-up letter to Miller and the same day that former Defendant Rosa wrote the shakedown slip for Manuel. The creation of that entire shakedown slip was very suspicious. The basis for it was that one inmate had claimed that Manuel had asked them to help him in his lawsuit, and on that basis alone, that unsubstantiated allegation, the prison officials wrote a shakedown slip for Manuel's cell for an alleged petition, and no point in the record does it show that there was ever a petition found in Manuel's cell, yet the petition was the basis for the shakedown and one of the charges that was used to justify Manuel's extreme punishments. And then after the suspicious creation of the shakedown slip, we have the suspicious execution of the shakedown slip. The slip sat there for 10 days until Miller confronted Manuel about his grievances. Then with binding speed, Defendant Nally decided to execute the shakedown slip. Defendant Nally was the same correctional officer who had originally investigated the assault, so he knew about the events that were the basis for Manuel's complaints. There is no evidence in the record for why the shakedown happened at that precise moment. There's no evidence in the record for why Defendant Nally was the one who executed the shakedown. Wasn't there a distinction between what Nally did and Miller? There is a distinction in the roles they played, but we would argue that they both played a role in the shakedown and the subsequent events that happened. And the legal standard here for 1983 liability, which comes from Kuhn v. Goodloe, is that the defendant has to have caused or participated in the deprivations. And so we think there is sufficient evidence to show that both Miller and Nally participated in the deprivations that happened, even though they were acting at different points in this series of events. I just was under the impression that Miller knew more about litigation and preparation than what they dug into or found. She did. So there is direct evidence that she knew about the protected activity because she was the recipient of the grievances. So there's no question that she had knowledge about the protected activity. And then she confronts Manuel, and a mere nine minutes later, the shakedown slip that was written ten days earlier is executed by defendant Nally. Okay. So what told him all of what he was going to be looking for? Is that the way it worked? No. The suspicious timing gives an inference. Because Miller knew all that, right? Knew all what? Because of the grievances and whatever she did. I don't know what she did. You said she dealt with grievances. She was the counselor that Manuel had to send the grievance to. She was the gatekeeper to his ability to proceed through the grievance process. And she was not answering his grievances. Okay. Well, she knew more than Nally did, right? There's direct evidence that she knew about the protected speech, but there's a lot of indirect evidence that Nally knew. There's testimony from the prison employee that even the warden had known about Manuel's lawsuit. And it's important to remember that we are talking about one small housing wing that's a drug treatment program of the prison. And this court has said that when there's a small universe of employees, it's a reasonable inference that a grapevine exists. And so we have that reasonable inference because this is a small wing of the prison. We are not talking about word getting around the entire prison. And then we have the direct testimony that even the warden knew about the lawsuit, and that's why he had directed another inmate to steal the lawsuit papers. So there is a lot of indirect evidence about Nally's knowledge as well. And then in order to execute the shakedown, he had to have read the shakedown slip to know what he was looking for in the cell. And the basis for the shakedown slip was witness statements about Manuel's lawsuit. So there's evidence as to his knowledge as well. And further evidence of that knowledge is the extreme punishments that happened because of what Nally found in Manuel's cell. He confiscated a handful of items, and the shakedown record that he wrote, even says that the charges need to be substantiated. And it appears that there was no subsequent investigation once he took those items. He took those items, he immediately cuffed Manuel and sent him into segregation for investigative purposes, according to the record. But then the record shows no subsequent investigation. The only evidence that defendants have put forth is that there was the alleged prisoners who wrote the witness statements found in Manuel's cell, allegedly said that they actually didn't write those statements. But that's purely Nally's word in the offender disciplinary report. There's no actual document in the record that shows that these prisoners did say that. And then the report that Nally wrote served as the sole basis for the punishments that Manuel suffered. There was no other witnesses presented at the hearing. There was no other evidence offered. It was all based on Nally's report. And his report documented that he found papers that had case captions on them. And I see that I've gone into my rebuttal time. The papers had what on them? They had case captions on them. They were addressed to the United States District Court, and Defendant Nally recorded that down. So there's no question that he knew that these were papers about his lawsuit or protected speech. I will reserve the remaining time for rebuttal. Thank you, Counsel. Ms. Hanson. Good morning, and may it please the Court. I'm Assistant Attorney General Christina Hanson on behalf of Defendants Appellees Nick Nally and Cindy Miller. An inmate's cell is always subject to search, and here there was no evidence that the search was conducted. Ms. Hanson, you're going to need to raise your voice. This is a very big room, and that microphone records but doesn't really amplify. My apologies, Your Honor. An inmate's cell is always subject to search, and here there was no evidence that the search was conducted for retaliatory reasons. Days before the search, a department employee documented an incident involving Manuel. According to her incident report and shakedown slip, she had been approached by an inmate who reported that Manuel had approached him to fill out petition papers. The search was conducted and identified contraband. It identified handwritten and typed letters addressed to the court, a cassette tape, and a letter demonstrating trading and trafficking. While Manuel argues that the disciplinary charges and his placement in segregation were unwarranted, the disciplinary report issued to Hamreflex that a reviewing officer and hearing investigator reviewed and signed off on the disciplinary charges as well as his placement in segregation, based on the nature of the offense. Finally, it was not Nally that issued punishment. It was the Adjustment Committee, after a hearing, who found Manuel guilty of forgery, contraband, unauthorized property, and petitions, postings, and business ventures. According to the final summary report, the Adjustment Committee imposed discipline, including a period of segregation, revocation of good time credits, and the disciplinary transfer. And there was no evidence that Nally's action in conducting the search was motivated by his protected activity. He points to a few things in the record that he suggests create an inference of causation, but he doesn't tie Nally to any of those actual events. He suggests that the timing, the nine-minute delay between his conversation with Miller, in which he claims that Miller informed him that he submitted his grievances to Miller and he also submitted some follow-up letters. And his testimony as to the gist of that conversation that he had with Miller was that she told him to stop sending letters because she had more than 14 days to respond to his grievances. And the shakedown of his cell occurred nine minutes later. But there's nothing tying Nally to that conversation. Nally wasn't a part of that conversation. He wasn't referenced in that conversation. Nally didn't subsequently reference that conversation when he conducted the search. There's simply no evidence tying those two together. Why do you conduct the search? Inmate cells are subject to search at any time, and there was evidence in the record based on the preceding disciplinary incident from June 12th that he might have contraband. And contraband was actually found in the cell. Well, it wasn't the so-called protected stuff. Well, it doesn't need to be. It's not like he was executing a search warrant looking for a particular thing. He was conducting a search of a cell, so anything that was found that was suspicious or potentially contraband, he would be obligated to confiscate and create a disciplinary report, and that's exactly what he did. And there was process after that in the sense that the disciplinary report was prepared and the issue went before the Adjustment Committee. And so Mr. Manuel had a hearing with respect to the contraband, and it was found that he was indeed in possession of contraband. But as to the search itself, there's really no evidence indicating that he was motivated by Manuel's protected activity. There's nothing suggesting that he knew that that conversation between Miller and Manuel had even occurred, but even so, the timing of that conversation itself is not the protected activity. So to look at the interval of time between that conversation and the search doesn't really tie the conduct that he's alleging is wrongful to his protected activity. He started filing his grievances long before that. Is this sort of a coincidence? There's no evidence that it's anything other than a coincidence, and there's no reason to infer, like I said, that he had knowledge of the conversation, that Nally had knowledge of the conversation. Neither Miller nor Nally were implicated in the grievances or the subject of the lawsuit that Manuel was planning to file, so it's not like it would raise an inference that she was, you know, warning him about the grievances or something like that. Was her position in some sort of a capsule where anybody that talked to her, she didn't pass it on or some kind of confidentiality for Miller's position? What is her title? She's the grievance counselor. So she was aware of the grievances because the evidence on summary judgment is that he presented the grievances that he would have submitted the grievances to Miller. I just wonder if that's some kind of protected speech within a prison. I don't know if anything's protected in a prison, frankly. The conversation between him and Miller. I don't think there's any basis for considering that conversation protected speech. It wasn't an oral grievance. All right, that's all I want to know. Yeah, from his perspective, he wasn't the one initiating the conversation. It was Miller telling him that she had more than 14 days to respond to his grievances. So I don't think, you know, on the evidence in the record, on his own testimony of the conversation, it couldn't be viewed as an oral grievance. It was just a conversation about the grievances. What did they find with Nally's search? The documents that were, the contraband that was uncovered with the search were two handwritten letters, two typed documents to the district court. They appeared to be declarations and a note regarding trading and trafficking. And there was evidence that the people that were named, the two purported authors of the handwritten letters, both submitted statements that they didn't author, that they weren't involved in the preparation of those letters. And that was the same case with respect to the typed documents that he confiscated. The Adjustment Committee report indicates that the two inmates that were named in those documents as well issued statements that they didn't have any knowledge of them and that they didn't participate in their creation. And so that was the basis of the discipline. Beyond the conversation, beyond the timing of the conversation between Miller and Nally, plaintiff points suggest that there's inference of causation from the fact that he claims that the June 12 incident was suspect because it was witnessed by Shaw Rosa, who was actually one of the defendants in the lawsuit that he was filing. But again, there's nothing tying that to Nally. Even if we were to assume that's correct, that there was something suspect about that discipline on June 12, there's nothing suggesting that Nally would have had any reason to know that the record of that incident was anything other than legitimate. And then she also, plaintiff also points to the law librarian's testimony and suggests that Nally was hostile towards prisoner litigation. But her testimony was actually that he made some comments to her to the effect that she shouldn't be helping inmates file lawsuits. And there's no temporal proximity between that conversation and the search of his cell. And so that doesn't really go to his, that doesn't really implicate causation in this case. It doesn't create an inference that he was motivated on this occasion to search Manuel's cell because of comments that he had made in the past to the law librarian. There's also no evidence that he was in any way involved. The law librarian also testified to, you know, that Shaw Rosa had attempted to obtain a copy of his lawsuit. There's no evidence that Nally was in any way involved in that. And with respect to Miller, although she was aware of the potential grievances, there's no evidence that she was involved in any way in the search. So for that reason, we ask that you affirm summary judgment. Thank you. Thank you, Ms. Hanson. Anything further, Ms. Squires? I just want to make a few points. The first one being that this court held in Mays v. Springborn that a follow-up to a grievance is actually protected speech. And the conversation between Miller and Manuel is considered a follow-up to the grievance. The whole point of the conversation was her telling Manuel she was upset about how much he was following up about his grievances. So that is protected activity, and that is when the clock would start for suspicious timing in this case. As a defendant, Nally, I think it's important to consider the legal standards here. There doesn't have to be direct evidence that he had actual knowledge of the protected activity. A reasonable inference of knowledge is enough, and that comes from Ridings v. Riverside Medical Center. And the court has found in other cases that suspicious timing plus a third-party testimony about defendant's motives, which is exactly what we have here, is enough to raise that reasonable inference of knowledge. Again, at this stage, all inferences are in Manuel's favor. And then to what items that Nally found, Manuel has explicitly said these items were not his. There was no follow-up investigation about that, and there's direct evidence that another inmate was in his storage box. And so that questions the legitimacy of what Nally found and the charges that were brought. And if there are no further questions, we'd rest on our briefs. Thank you very much, Ms. Squires. And, Ms. Squires, the court appreciates your willingness and that of your law firm to volunteer your services in this case. You've assisted the court as well as your client. Thank you.